UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

SHAWN FEAON PICKENS,

               Petitioner,                      Case No. 1:23-cv-106

v.                                        Honorable Paul L. Maloney

MICHAEL BURGESS,

               Respondent.

_____/

## <u>OPINION</u>

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Shawn Feaon Pickens is incarcerated with the Michigan Department of Corrections (MDOC) at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan. On December 10, 2018, following a ten-day jury trial in the Ingham County Circuit Court, Petitioner was convicted of carrying a concealed weapon (CCW), in violation of Mich. Comp. Laws § 750.227, use of a firearm during the commission of a felony (felony-firearm), in violation of Mich. Comp. Laws § 750.227b, assault with the intent to commit murder (AWIM), in violation of Mich. Comp. Laws § 750.83, and first-degree premeditated murder, in violation of Mich. Comp. Laws § 750.316. On January 16, 2019, the court sentenced Petitioner to concurrent prison terms of 2 to 5 years for CCW; 31 years, 3 months to 58 years, 4 months for AWIM; and life without parole for first-degree murder. Those sentences were preceded by a two-year sentence for felony-firearm.

On January 29, 2023, Petitioner, through counsel, filed his habeas corpus petition, raising the following three grounds for relief:

I.      MR. PICKENS WAS DEPRIVED OF THE FAIR TRIAL GUARANTEED BY THE US CONSTITUTION WHEN THE PROSECUTION KNOWINGLY PRESENTED FALSE IDENTIFICATION TESTIMONY BY YEMORA WILLIAMS, A KEY PROSECUTION WITNESS.

II.     MR. PICKENS'S CONVICTION AND SENTENCE SHOULD BE VACATED AND AN ORDER OF ACQUITTAL ENTERED WHERE THE PROSECUTOR FAILED TO PRESENT CONSTITUTIONALLY SUFFICIENT EVIDENCE THAT MR. PICKENS WAS RESPONSIBLE FOR THE SHOOTINGS THAT OCCURRED INSIDE THE KUTT II BARBERSHOP ON FEBRUARY 11, 2017, AND THE TRIAL COURT ERRED IN DENYING MR. PICKENS'S MOTION FOR DIRECTED VERDICT ON THIS ISSUE.

III.    MR. PICKENS WAS DEPRIVED OF HIS RIGHT TO EFFECTIVE COUNSEL WHEN TRIAL COUNSEL (A) FAILED TO OBJECT TO THE PROSECUTION'S INTRODUCTION OF FALSE IDENTIFICATION TESTIMONY AND (B) FAILED TO INVESTIGATE ALIBI DEFENSE.

(§ 2254 Pet., ECF No. 1, PageID.6.) Respondent contends that Petitioner's § 2254 petition is meritless.[1] (ECF No. 6.) For the following reasons, the Court concludes that Petitioner has failed to set forth a meritorious federal ground for habeas relief and will, therefore, deny his petition for writ of habeas corpus.

---

[1] Respondent also argues that Petitioner's first ground for relief is procedurally defaulted. (ECF No. 6, PageID.168.) Respondent recognizes, however, that a habeas corpus petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See* 28 U.S.C. § 2254(b)(2). Furthermore, the Supreme Court has held that federal courts are not required to address a procedural default issue before deciding against the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."); *see also Overton v. Macauley*, 822 F. App'x 341, 345 (6th Cir. 2020) ("Although procedural default often appears as a preliminary question, we may decide the merits first."); *Hudson v. Jones*, 351 F.3d 212, 215–16 (6th Cir. 2003) (citing *Lambrix*, 520 U.S. at 525; *Nobles v. Johnson*, 127 F.3d 409, 423–24 (5th Cir. 1997); 28 U.S.C. § 2254(b)(2)). Here, rather than conduct a lengthy inquiry into exhaustion and procedural default, judicial economy favors proceeding directly to a discussion of the merits of Petitioner's claims.

## Discussion

### I.    Factual Allegations and Procedural History

The Michigan Court of Appeals described the events underlying Petitioner's convictions as follows:

> [Petitioner's] convictions arose from his entry into a crowded barbershop where he shot and killed a barbershop patron seated on a window ledge and shot another patron near the intended victim. The victim was able to fire his own weapon back at [Petitioner], injuring him. When [Petitioner] shot the victim, he stood in front of a woman also seated on the ledge, and she identified him at trial as the shooter. Defendant fled the scene in a burgundy Bonneville or Grand Prix, but was dropped off at the hospital by the driver of a white Mercury Mountaineer. At the hospital, he declined to tell police the location of his shooting and to provide any identification of the shooter. The police were given his clothing and cell phone by hospital personnel. The prosecutor presented direct eyewitness testimony to support [Petitioner's] identification as the perpetrator, and [Petitioner] was convicted as charged.

*People v. Pickens*, No. 347406, 2021 WL 1499318, at *1 (Mich. Ct. App. Apr. 15, 2021).

Jury selection for Petitioner's trial occurred on November 26, 2018. (Trial Tr. I, ECF No. 7-9.) Over the course of six days, the jury heard testimony from numerous witnesses, including Yemora Williams, who presented eyewitness testimony. (Trial Tr. II, III, IV, V, VI, & VII, ECF Nos. 7-10, 7-11, 7-12, 7-13, 7-14, and 7-15.) On December 10, 2018, after deliberating for the morning and into the afternoon, the jury returned a guilty verdict. (Trial Tr. IX, ECF No. 7-17, PageID.1032–1033.) Petitioner appeared before the trial court for sentencing on January 16, 2019. (ECF No. 7-18.)

Petitioner, with the assistance of counsel, appealed his convictions and sentences to the Michigan Court of Appeals, arguing that the evidence was insufficient to support the first-degree murder conviction, and that trial counsel had rendered ineffective assistance. (ECF No. 7-25, PageID.1668.) Petitioner also filed a *pro per* supplemental brief, raising numerous due process and ineffective assistance of counsel claims. (*Id.*, PageID.1702–1703.)

Petitioner, through counsel, subsequently filed a motion to remand, which the court of appeals granted in an order entered on December 13, 2019. (*Id.*, PageID.1631.) The court of appeals remanded the matter to the trial court "to allow [Petitioner] to file a motion for a new trial and have an evidentiary hearing on the claims of ineffective assistance of counsel raised in the motion to remand." (*Id.*) In his motion for a new trial, Petitioner asserted that trial counsel was ineffective for: (1) failing to investigate a possible alibi defense; and (2) failing to argue and present evidence that Petitioner was shot elsewhere. (ECF No. 7-23, PageID.1410.)

The trial court conducted an evidentiary hearing pursuant to *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973),[2] on January 30, 2020, and March 13, 2020. (ECF Nos. 7-19, 7-20.) At the hearing, the trial court heard testimony from law enforcement officer Quincy Scroggins, proposed alibi witness Peter Watkins, and trial counsel Henry Scharg. (*Id.*) On June 2, 2020, the trial court issued an opinion and order denying Petitioner's motion for a new trial. (ECF No. 7-24, PageID.1520–1536.)

Petitioner subsequently retained new appellate counsel, who filed a motion to withdraw all previously-filed appellate briefs. (ECF No. 7-25, PageID.1625.) The Michigan Court of Appeals granted that motion. Petitioner, through counsel, then raised the following claims on appeal: (1) the prosecutor committed misconduct by knowingly presenting false identification testimony from Yemora Williams, the key eyewitness; (2) there was insufficient identification evidence to support his convictions and sentences; (3) the trial court erroneously admitted cell phone data that was obtained as a result of an unconstitutional search; (4) the cell phone records should have been

---

[2] A *Ginther* hearing allows a criminal defendant to proffer facts or evidence in support of a claim of ineffective assistance of counsel. *See Ceasor v. Ocwieja*, 655 F. App'x 263, 266, 271 (6th Cir. 2016).

4

suppressed because they were obtained pursuant to a court order instead of a search warrant; (5) trial counsel was ineffective by stipulating to allow lay witness Megan Johnston to provide testimony regarding cell phone data; (6) counsel was ineffective for failing to retain an expert witness regarding cell phone analysis; (7) counsel should have objected to the seizure of his clothing, wallet, and cell phone form the hospital; (8) counsel failed to object to the admission of false testimony; and (9) the trial court erred by denying Petitioner's motion for a new trial following the *Ginther* hearing. *See generally Pickens*, 2021 WL 1499318. The Michigan Court of appeals rejected Petitioner's arguments and affirmed his convictions and sentences on April 15, 2021. *See id.* at *1. The Michigan Supreme Court denied Petitioner's application for leave to appeal on November 2, 2021. *See People v. Pickens*, 965 N.W.2d 521 (Mich. 2021). This § 2254 petition followed.

## II.    AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020)

5

(internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

"[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotation marks omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can review the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d

at 721. Then, the petitioner's claim is reviewed *de novo*. *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III.    Discussion

### A.    Ground I—Presentation of False Testimony

Petitioner's first ground for relief is that the prosecution "knowingly presented false identification testimony by Yemora Williams, a key prosecution witness." (§ 2254 Pet., ECF No. 1, PageID.6.) Petitioner contends that the court of appeals erred by characterizing this issue "as mere 'disagreement' with Yemora Williams' testimony." (Br. Supp. § 2254 Pet., ECF No. 1-1, PageID.40.) Instead, according to Petitioner, there is no evidence in the record to "support the conclusion that Ms. Williams did actually see the shooter in the barbershop." (*Id.*)

The Fourteenth Amendment's right to due process prohibits a state from knowingly and deliberately using perjured evidence to obtain a conviction. *See Napue v. Illinois*, 360 U.S. 264, 260 (1959). The Supreme Court repeatedly has recognized that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). Presentation of perjured testimony, without more, however, does not rise to the level of a constitutional violation. *See Briscoe v. LaHue*, 460 U.S. 325, 327 (1983). Rather,

> [t]he knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. In order to establish prosecutorial misconduct or denial of due process, the defendants must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.

*United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) (citations omitted).

8

Petitioner raised this claim on direct appeal, and the Michigan Court of Appeals rejected

it, writing:

> Contrary to the defense assertion, there is no indication in the record that eyewitness Yemora Williams testified falsely. A conflict between a witness's description of an assailant and other relevant evidence presents an issue for resolution by the jury. See *People v. Savage*, 327 Mich. App. 604, 614, 935 N.W.2d 69 (2019). This Court must defer to the jury's role in determining the weight of the evidence and the credibility of the witnesses, and we resolve conflicts in the evidence in favor of the prosecution. *Id.* The jury may believe or disbelieve, in whole or in part, the evidence admitted at trial. *People v. Unger*, 278 Mich. App. 210, 228, 749 N.W.2d 272 (2008). That is, the trier of fact has the right to disregard all, part, or none of the testimony of a witness. *See People v. Goodchild*, 68 Mich. App. 226, 235, 242 N.W.2d 465 (1976). Thus, this Court will not weigh the competing evidence because the jury had the special opportunity to do so while assessing the credibility of the witnesses that appeared before it. *Unger*, 278 Mich. App. at 228-229, 749 N.W.2d 272.

> The jury did not find, and we have no reason to conclude, that Williams testified falsely. More importantly, there is no indication in the record that even if Williams did testify falsely, that the prosecutor knew she would not testify truthfully. *See Herndon*, 246 Mich. App. at 417, 633 N.W.2d 376. Williams testified that she brought her son to the barbershop and was seated on the ledge closest to the door with her son next to her. A man entered the barbershop, and her view was at his waist level because of her seated position. The man reached into his pants, and Williams was about to admonish him for his inappropriate conduct when he pulled a gun and began firing. Williams testified that she pushed her son behind her and leaned away from the gun. She could hear return gunfire. Williams was able to describe [Petitioner's] appearance. Although she may have contradicted [Petitioner's] race or skin-tone between her statements and 911 call, Williams expressed that she could identify [Petitioner] because of his eyes.

> When examined in light of testimony from other witnesses, Williams appeared to be mistaken that, after [Petitioner] left the barbershop, he approached her for a ride to the hospital. Williams testified that [Petitioner] left the barbershop before her and then paused at a wall. However, she went in the opposite direction, lived by the "street code" that what occurred was none of her business, and had a criminal history in her past that she attributed to drug and alcohol use. She had no intention of testifying and was surprised when the police were able to contact her from her 911 call. However, Williams changed her mind when she was contacted by her niece who knew the victim's family. Williams recognized that her statements regarding the skin-tone of [Petitioner] varied, but explained that she was emotional and excited after the shooting when she made her 911 call.

9

Williams may have believed that [Petitioner] followed her to her car and requested a ride, but Francoise Bigelow left the barbershop with her son after his hair was cut. She was parked directly in front of the barbershop when she heard popping sounds and saw the window of the barbershop vibrating. She told her son to leave the passenger side of the car and come to her at the driver's side. She saw a man exit the barbershop carrying a silver gun. Bigelow did not see this man follow Williams to the parking lot and request a ride. Rather, she saw him proceed to and enter a waiting vehicle, and the vehicle sped off.

Similarly, Jordin Ward was in his vehicle, stopped at a traffic light near the barbershop when he heard 12 to 15 "pops" that sounded like fireworks. Ward saw a man run from the barbershop with a chrome color gun in his hand and jump into the passenger side of a burgundy Bonneville or Grand Prix, which was in the driveway on the side of the building, but then sped off. Ward then witnessed multiple people come out of the barbershop, including an older woman and child. A white male, Isiah Naranjo-Gale (Gale), was shot and bleeding, banged on Ward's passenger window, and stated, "Call 911." Accordingly, Ward testified consistently with Bigelow, that [Petitioner] left the barbershop carrying his silver gun in his hand and fled in a waiting vehicle. Thus, when Williams was approached by a man in the parking lot, she identified [Petitioner], but it was presumably Gale because [Petitioner] immediately left the scene according to Ward and Bigelow.

However, a conflict in the evidence between the testimony of Williams, Bigelow, and Ward required the jury to evaluate the credibility of the witnesses, and the jury was not required to believe all of the testimony offered by Williams. Rather, in accordance with the criminal jury instructions, M. Crim. JI 2.6 entitled Judging Credibility and Weight of Evidence, the jury does "not have to accept or reject everything a witness says," but is "free to believe all, none, or part of any person's testimony." *See also Unger*, 278 Mich. App. at 228, 749 N.W.2d 272; *Goodchild*, 68 Mich. App. at 235, 242 N.W.2d 465. The jury was entitled to conclude that Williams positively identified [Petitioner] as the shooter in light of the fact that he stopped immediately in front of her, pulled a gun, and began firing. Williams was able to advise that the victim returned gunfire in light of the sound of the exchange occurring from another area of the room. Moreover, Williams explained her history and indicated why she would be mistaken as to the identification of [Petitioner] approaching her instead of Gale. Williams lived by a "street code," had a criminal past, and had no intention of testifying at trial. However, after being contacted by her niece and empathizing that the victim was a son to a mother, Williams agreed to come forward. Thus, the jury was entitled to give credence to the identification by Williams that [Petitioner] was the barbershop shooter. Despite [Petitioner's] assertion, a mistake by Williams regarding who approached her in the parking lot (as indicated by the testimony of Bigelow and Ward) does not equate with the prosecutor presenting false or perjured testimony. The jury was able to account for witness mistakes in testimony because jurors need not accept all of it in order to

find a witness credible. [Petitioner] failed to establish plain error affecting his substantial rights.

*Pickens*, 2021 WL 1499318, at *2–3.

In his § 2254 petition, Petitioner avers that the court of appeals erred in its conclusion because the "prosecutor knew that Williams had never identified [Petitioner] at all." (Br. Supp. § 2254 Pet., ECF No. 1-1, PageID.43.) Petitioner argues:

> [N]one of the officers on the evening of Williams' initial interview showed Williams a picture of Naranjo-Gale. According to Officer Hogan, Williams had never been asked to participate in a photo lineup (although, oddly, Williams seemed to vividly remember being shown photos in a lineup). Additionally, Williams gave her mistaken account and obviously false in-court identification at [Petitioner's] preliminary examination. The prosecutor therefore knew exactly how she would later testify before a jury. The prosecutor asked Ms. Williams repeatedly, and she confirmed with 100% certainty, that the "shooter" she identified was the man that approached her car.

(*Id.*, PageID.44.)

Petitioner goes on to contend that the Michigan Court of Appeals' ruling "rests on an unreasonable determination of the facts." (*Id.*, PageID.46.) He argues that the court of appeals' "claimed focus on the record evidence is belied by the contradictions contained within its own written opinion." (*Id.*, PageID.47.) For example, Petitioner points out the fact that the court of appeals "itself acknowledged that the shooter was ***not*** the same person that Wiliams saw in the parking lot," and that Williams gave various descriptions of Petitioner's skin-tone to both the 911 operator and police. (*Id.*) Petitioner suggests further that the court of appeals' decision is unreasonable because it conflicts with *People v. Brown*, 958 N.W.2d 60 (2020), which Petitioner asserts dealt with "nearly identical facts." (*Id.*) The Court, however, need not address these arguments, because Petitioner fails to provide any evidence, much less clear and convincing

11

evidence, to overcome the court of appeals' conclusion that the prosecutor was aware of any falsities in Williams' testimony and presented her as a witness regardless.

Petitioner provides a thorough summary of the testimony and evidence provided at trial, as well as a description of how Williams' testimony aligned with and differed from that provided by other witnesses. Indeed, the court of appeals' discussion, set forth *supra*, highlights the internal inconsistencies in Williams' testimony, as well as the inconsistencies between her testimony and testimony given by other witnesses. The Court's review of the trial record corroborates that those inconsistencies certainly exist. However, as the Sixth Circuit has noted, "mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony," and it is Petitioner's burden to show that the prosecution knew any such testimony was false. *See Lochmondy*, 890 F.2d at 822. Even if Williams never participated in a photo lineup and was never shown a picture of Naranjo-Gale during her initial interview, Petitioner provides no definitive evidence to demonstrate that these facts equate to a conclusion that "the prosecutor knew that Williams had never identified [Petitioner] at all." (Br. Supp. § 2254 Pet., ECF No. 1-1, PageID.43.) Instead, Petitioner relies on his speculations and the inconsistencies in the testimony to support his argument that the prosecutor was aware of falsities in Williams' testimony. That is insufficient for Petitioner to meet his burden on federal habeas review.

For the foregoing reasons, Petitioner has failed to demonstrate that the court of appeals' rejection of this claim is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief with respect to ground I.

## B.    Ground II—Sufficiency of the Evidence

As his second ground for relief, Petitioner contends that the "prosecutor failed to present constitutionally sufficient evidence that [Petitioner] was responsible for the shootings that occurred

inside the Kutt II Barbershop on February 11, 2017, and the trial court erred in denying [Petitioner's] motion for directed verdict on this issue."[3] (§ 2254 Pet., ECF No. 1, PageID.6.) Petitioner avers that there was insufficient evidence regarding the identity of the shooter because Williams' identification testimony was false. (Br. Supp. § 2254 Pet., ECF No. 1-1, PageID.50.)

Petitioner raised this argument on direct appeal, and the Michigan Court of Appeals addressed it under the following standard:

> A challenge to the sufficiency of the evidence is reviewed de novo. *People v. Thorne*, 322 Mich. App. 340, 344, 912 N.W.2d 560 (2017). The evidence is examined in a light most favorable to the prosecution to determine whether a rational trier of fact could conclude that the prosecutor proved the elements of the crime beyond a reasonable doubt. *People v. Miller*, 326 Mich. App. 719, 735, 929 N.W.2d 821 (2019). "Conflicting evidence and disputed facts are to be resolved by the trier of fact." *Id.* The credibility of identification testimony presents a question for the jury that this Court does not resolve anew. *People v. Davis*, 241 Mich. App. 697, 700, 617 N.W.2d 381 (2000). "[P]ositive identification by witnesses may be sufficient to support a conviction of a crime." *Id.*

*Pickens*, 2021 WL 1499318, at *4.

Although the court of appeals cited state authority, the standard applied is identical to the constitutional "sufficiency of the evidence" standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), which requires the court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319.

---

[3] Although the standards for granting a directed verdict and finding the evidence was constitutionally insufficient might be similar, whether the trial court should have entered a directed verdict is purely an issue of state law and is not cognizable on habeas review. *See, e.g., King v. Trippet*, 27 F. App'x 506, 510 (6th Cir. 2001) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)); *Holloway v. Palmer*, No. 16-2450, 2017 WL 4844457, at *3 (6th Cir. Apr. 5, 2017) (citing *King*).

The state court's application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams v. Taylor*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

*Id.* at 406. Therefore, because the Michigan Court of Appeals applied the correct standard—here *Jackson* rather than *Strickland*—Petitioner can only overcome the deference afforded state court decisions if the determination regarding Petitioner's sufficiency of the evidence challenge is an unreasonable application of *Jackson* or if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d).

14

The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Witness credibility remains the province of the jury, *see Herrera v. Collins*, 506 U.S. 390, 401–02 (1993), and an attack on witness credibility constitutes a challenge to the quality, but not the sufficiency of the government's evidence. *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). The habeas court need only examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196–97 (6th Cir. 1988).

Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Here, the court of appeals followed *Jackson*'s command by considering the identification evidence in a light that favored the prosecution:

> There was sufficient evidence to support [Petitioner's] identification as the barbershop shooter and, in turn, his convictions. Williams expressly testified that she was seated on the window ledge of the barbershop when [Petitioner] entered. He stood in front of her and pulled a gun from his pants and began firing. Although Williams initially believed that [Petitioner] wore a mask, at trial, she testified that she believed it was his hoodie. Williams admittedly gave various descriptions of [Petitioner's] skin-tone to the 911 operator and the police. However, she expressed with certainty, by his eyes, that [Petitioner] was the shooter.

15

Indeed, cell phone data placed [Petitioner] in the area of the barbershop. Because the barbershop was located near the home of [Petitioner's] employer it was equally plausible that the tracking data reflected his presence at that home. However, the individual who drove [Petitioner] to the hospital testified that [Petitioner] told her he was shot in the barbershop, albeit without admitting that he was the shooter. Conflicts in the evidence and credibility determinations were for the trier of fact to resolve. *Unger*, 278 Mich. App. at 228-299, 749 N.W.2d 272.

Finally, Williams testified that [Petitioner] was shot in the side when he left the barbershop, and he appeared at the hospital with a gunshot wound to his left abdomen. The jury found by its verdict that the identification by Williams coupled with the circumstantial evidence of [Petitioner's] injury and his phone records was proof beyond a reasonable doubt that [Petitioner] entered the barbershop, killed the victim, assaulted nearby bystander Gale by shooting him, and did so contrary to Michigan's firearm statutes. Viewing the evidence in the light most favorable to the prosecution and in light of the jury's assessment of the credibility of the witnesses, there was sufficient evidence for the jury to find [Petitioner's] identification as the barbershop shooter.

*Pickens*, 2021 WL 1499318, at *4.

In these § 2254 proceedings, Petitioner asserts that the prosecution presented insufficient evidence regarding the identity of the shooter because Williams' identification testimony was false. (Br. Supp. § 2254 Pet., ECF No. 1-1, PageID.50.) Petitioner notes that "[s]etting aside Williams's false identification, not one eyewitness identified [Petitioner] as the shooter in a photo lineup or at trial." (*Id.*, PageID.51.) Petitioner also avers that "[t]here is no forensic evidence connecting [Petitioner] to the barbershop." (*Id.*)

Petitioner goes on to argue that the court of appeals' determination is an unreasonable application of facts, stating:

For the same reasons that the Michigan Court of Appeals' decision to deny relief for the prosecutor's misuse of false, fabricated, or substantially misleading testimony was based on an unreasonable determination of facts, so too is it decision to deny relief for insufficient evidence to sustain the conviction. The Court of Appeals conceded that [Petitioner's] conviction was substantially based on the false in-court identification of [Petitioner] as the shooter: "The jury found by its verdict that the identification by Williams coupled with the circumstantial evidence of defendant's injury and his cell phone records was proof beyond a reasonable doubt

16

that defendant entered the barbershop, killed the victim, assaulted nearby bystander Gale by shooting him, and did so contrary to Michigan's firearm statutes." *Pickens*, unpub op at *5 (Appendix A). Setting aside the egregious speculation here by the Court of Appeals, who know nothing about the jury's decision other than that the jury marked "guilty" on a verdict form, it is still clear that the Court of Appeals acknowledged the centrality of Williams' identification testimony to the conviction. Indeed, at various other points in their written opinion, the Court of Appeals acknowledges an alternative explanation for the cell phone evidence, the possibility of an alternative explanation for [Petitioner's] gunshot wound, and the lack of any other evidence connecting [Petitioner] to the Kutt II Barbershop.

(*Id.*, PageID.53.)

To prevail on his sufficiency claim now, Petitioner must show that the inferences urged by the appellate court are unreasonable. Notably, "[t]he facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016). As noted above, Petitioner contends that the court of appeals' facts are unreasonable based on his dogged assertion that the prosecutor presented false testimony from Williams regarding the identity of the shooter. Petitioner can overcome the presumption that the court of appeals' recitation of facts is presumed correct by presenting clear and convincing evidence. Here, however, for the same reasons the Court has rejected Petitioner's first ground for relief, Petitioner presents no such evidence.

Throughout his petition, Petitioner disclaims that he is challenging Williams' credibility. However, there is no other way to read Petitioner's argument. Petitioner latches on to Williams' mistaken testimony that the shooter as the same person who approached her car after the incident to "establish" that the person who approached her car was the victim of the assault with intent to murder, not the shooter. Because of that mistake, Petitioner argues, Williams' entire testimony is not worthy of consideration.

17

Petitioner essentially invites this Court to reweigh the witnesses' credibility—particularly Williams' credibility—and resolve all conflicts and make all inferences in his favor. Under *Jackson*, a habeas court is not required to sift through the evidence and place it on one side of the scale or the other for the purpose of assessing whether the jurors' estimation of the balance is correct. Instead, the Court is only required to look at the evidence in a light that favors the prosecution and assess whether a rational factfinder could conclude that Petitioner is guilty beyond a reasonable doubt considering that evidence. It is up to the jury to decide issues of credibility, to decide between conflicting accounts, and draw inferences—so long as the inferences are reasonable. *See Herrera*, 506 U.S. at 401–02; *Martin*, 280 F.3d at 618. Petitioner's invitation turns the *Jackson* standard on its head.

In *Coleman v. Johnson*, 566 U.S. 650, 655 (2012), the Supreme Court provided some guidance with respect to the distinction between a reasonable inference and mere speculation. Based on the Court's analysis, a reasonable inference is an inference that a rational factfinder could make from the facts. That is hardly an earth-shattering revelation, and it is not a particularly onerous burden. The Court went so far as to say that "the only question under *Jackson* is whether [a] finding is so insupportable as to fall below the threshold of bare rationality." *Id.* at 656.

Petitioner has offered nothing—aside from his argument that Williams' testimony is not worthy of consideration—from which this Court could conclude that the court of appeals' inferences were irrational. At Petitioner's trial, both victim Naranjo-Gale and Francoise Bigelow testified that they observed a man wearing a hoodie. (Trial Tr. IV, ECF No. 7-12, PageID.623, 666.) Naranjo-Gale saw the man enter Kutt II, and Bigelow saw him exit with a gun in his right hand. (*Id.*, PageID.623, 666.) Naranjo-Gale saw the man holding a gun in his hand. (*Id.*, PageID.623.)

18

Kimberly Gray testified that as she was parking her car in a lot to the west of Kutt II, she noticed a burgundy car driving behind her. (*Id.*, PageID.630.) Gray noticed two individuals inside the vehicle, and she was unsettled by how the people were staring at her. (*Id.*) As she and her son walked toward Kutt II, she heard a car door shut, and looked back to see two men behind her, both with their hoodies up. (*Id.*, PageID.631.) Naranjo-Gale and Bigelow testified that the man they observed with a hoodie was light-skinned, and Naranjo-Gale testified that the man in question had facial hair. (*Id.*, PageID.623, 666.) Gray testified further that after she left the shop with her son, she noticed that the burgundy Pontiac was no longer in the lot. (*Id.*, PageID.634.) She subsequently provided a description of one of the men from the burgundy car, describing him as a fair-skinned black man with facial hair. (*Id.*, PageID.634, 635.)

Bigelow testified further that she observed the man with the gun walk to a burgundy vehicle waiting at the entrance to the parking lot and get inside the vehicle. (*Id.*, PageID.666–667.) She saw the vehicle turn right and speed down Kalamazoo street "toward the Capitol." (*Id.*, PageID.669.) Passerby Jordin Ward described seeing the same individual hop into the passenger seat of a burgundy Pontiac. (*Id.*, PageID.638.)

Officer Julie Thomas testified that she followed the ambulances containing the victims to Sparrow Hospital. (Trial Tr. II, ECF No. 7-10, PageID.554.) When she arrived at the hospital, an unknown individual advised her that an individual with gunshot wounds had arrived by private vehicle at the hospital that afternoon. (*Id.*) Hospital security footage was used to identify Petitioner as an individual who was dropped off by someone driving a white Mercury Mountaineer. (Trial Tr. VI, ECF No. 7-14, PageID.741.) Officer Thomas spoke to Petitioner while he was in the trauma room waiting to be treated for a gunshot wound to his abdomen. Petitioner refused to answer questions regarding how he had been injured. (Trial Tr. II, ECF No. 7-10, PageID.554–555.)

19

During Petitioner's trial, the parties agreed to the entry of two stipulations. (Trial Tr. IV, ECF No. 7-12, PageID.678.) Notably, the parties stipulated that on the evening of February 11, 2017, Officer Peter Howard conducted a traffic stop of a white Mercury Mountaineer registered to Miguel Payne. (*Id.*) Jessica Wisniewski was the driver, and Unesscia Perkins was the front seat passenger. (*Id.*) Officer Perkins "observed spots of suspected blood inside of the console just ahead of the gearshift." (*Id.*) The vehicle was towed to impound. (*Id.*)

On the evening of the shooting, Officer Peter Howard conducted a traffic stop of a white Mercury Mountaineer, similar to the one that hospital security footage indicated Petitioner was in when he was dropped off at the hospital. (Trial Tr. V, ECF No. 7-13, PageID. .) Officer Howard observed what appeared to be blood on the center console and seat belt. (*Id.*, PageID. .) He took the driver, Jessica Wisniewski, and her passenger, Unesscia Perkins, to the police station, and the vehicle was impounded. (*Id.*)

Wisniewski testified that at the time, she lived with her boyfriend Miguel Payne, and that their residence was about five minutes' walking distance from Kutt II. (*Id.*, PageID.684–685.) She knew Petitioner, who she referred to as "Mook," because he worked for her boyfriend's roofing company. (*Id.*, PageID.685.) Wisniewski testified that on the afternoon of the shooting, she was on the way to the mall with her daughter and Perkins when she received a call from her son. (*Id.*, PageID.687.) Wisniewski's son told her that Mook was at their house and that he had been shot. (*Id.*, PageID.688.) Wisniewski immediately turned around and drove home. (*Id.*)

When Wisniewski arrived home, she went up to the bathroom, where she found Petitioner, who had been shot in the abdomen. (*Id.*, PageID.688, 690.) She observed Petitioner remove his sweater, which Wisniewski described as a pullover. (*Id.*, PageID.690.) Petitioner asked

20

Wisniewski to take him to the hospital. (*Id.*, PageID.690.) Petitioner did not tell Wisniewski what had happened, and she did not ask any questions for details. (*Id.*, PageID.691.)

Wisniewski helped Petitioner downstairs and outside to the car. (*Id.*) She told Perkins to take Petitioner to the hospital. (*Id.*) Wisniewski went back into her home and cleaned blood off of her bathroom floor. (*Id.*, PageID.692.) She took the towel and Petitioner's pullover downstairs to the basement and left them in front of the dryer. (*Id.*)

Wisniewski testified further that she was interviewed by police on numerous occasions the night of the shooting. (*Id.*, PageID.693.) Ultimately, in exchange for providing truthful testimony at Petitioner's trial, Wisniewski was permitted to plead to a charge of lying to a police officer in a serious misdemeanor investigation. (*Id.*) She was charged as a result of her interviews at the Lansing Police Department. (*Id.*)

Unesscia Perkins testified that the Kutt II was within walking distance of Wisniewski's house. (*Id.*, PageID.699.) She testified that Wisniewski told her that they had to return to Wisniewski's house because someone had been shot. (*Id.*, PageID.701.) Perkins noted that when they arrived at the house, she saw Mook "coming out the house." (*Id.*, PageID.702.) However, Perkins admitted that she told the police that a person by the name of "Dro" had been outside the house when they arrived. (*Id.*)

Perkins drove Petitioner to Sparrow Hospital. (*Id.*, PageID.703.) Perkins testified that on the way to the hospital, Petitioner told her that "he was sitting down in the barbershop, ready to get his hair cut, and he just heard gunshots." (*Id.*) On cross-examination, Perkins testified that she asked Petitioner what had happened, and he volunteered that he was shot. (*Id.*, PageID.707.) When they arrived at the hospital, Perkins got a staff member to come outside with a wheelchair, and the

staff member wheeled Petitioner into the hospital. (*Id.*, PageID.704.) Perkins then returned to Wisniewski's house. (*Id.*)

Perkins testified that she and Wisniewski were stopped later that day while driving the Mercury Mountaineer. (*Id.*, PageID.705.) She admitted that she was not fully honest with police during the course of her interview. (*Id.*) Specifically, Perkins initially told officers that they had picked Mook off from the street, and that Wisniewski was the one who drove Petitioner ot the record. (*Id.*, PageID.706.) As a result, Perkins was charged with lying to a police officer in a violent crime investigation. (*Id.*, PageID.705.) However, she signed a plea agreement to plead guilty to lying to a peace officer in a serious misdemeanor investigation. (*Id.*) As part of the agreement, Perkins agreed to provide truthful testimony at Petitioner's trial. (*Id.*, PageID.705–706.)

The prosecution also presented testimony from Lansing Police Department Officer Megan Johnston, a crime analyst, who obtained cell tower data from phones associated with Petitioner and other individuals of interest. Officer Johnston compiled that data into charts and graphs. Officer Johnston created maps using proprietary software and, using those maps, determined that Petitioner's phone had been in the immediate vicinity of Kutt II around the time of the shooting. (Trial Tr. VIII, ECF No. 7-15, PageID.841, 848, 850.)

From the foregoing, even setting aside Williams' mistaken belief that the individual who approached her car was the shooter, there was sufficient evidence for the jury to infer and conclude that Petitioner was the individual who committed the shooting. Certainly, one could interpret the underlying events differently and reach the opposite conclusions, but that does not render the court of appeals' conclusions and inferences irrational. Petitioner, therefore, has failed to meet his burden.

In sum, Petitioner has failed to demonstrate that the court of appeals' determination that there was sufficient evidence to support Petitioner's convictions is contrary to, or an unreasonable application of, clearly established federal law. Petitioner, therefore, is not entitled to relief on habeas ground II.

### C.    Ground III—Ineffective Assistance of Trial Counsel

In his third and final ground for relief, Petitioner contends that trial counsel was constitutionally ineffective in two ways. (§ 2254 Pet., ECF No. 1, PageID.6.) First, Petitioner faults counsel for not objecting to the prosecution's introduction of false identification testimony. (*Id.*) Second, Petitioner argues that counsel failed to investigate an alibi defense. (*Id.*) Petitioner raised both grounds on direct appeal.

### 1.    Standard of Review

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the petitioner resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the

wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the petitioner is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011). Scrutiny of counsel's performance is "highly deferential", per *Strickland*, to avoid the temptation to second guess a strategy after-the-fact and to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Furthermore, scrutiny of the state court's scrutiny of counsel's performance must also be deferential, per 28 U.S.C. § 2254(d). In light of that double deference, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ." (citing *Harrington*, 562 U.S. at 102)).

Petitioner raised his ineffective assistance of counsel claims on direct appeal, and the Michigan Court of Appeals addressed them under the following standard:

> "Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions." *People v. Schrauben*, 314 Mich. App. 181, 189–190, 886 N.W.2d 173 (2016). To obtain a new trial premised on ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *People v. Vaughn*, 491 Mich. 642, 669, 821 N.W.2d 288 (2012). It is presumed that defense counsel was effective, and a defendant must overcome the strong presumption that counsel's performance was sound trial

24

> strategy. *People v. Trakhtenberg*, 493 Mich. 38, 52, 826 N.W.2d 136 (2012). "[D]ecisions regarding what evidence to present and which witnesses to call are presumed to be matters of trial strategy, and we will not second-guess strategic decisions with the benefit of hindsight." *People v. Dunigan*, 299 Mich. App. 579, 589-590, 831 N.W.2d 243 (2013). "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v. Ericksen*, 288 Mich. App. 192, 201, 793 N.W.2d 120 (2010). "The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *People v. Stewart (On Remand)*, 219 Mich. App. 38, 42, 555 N.W.2d 715 (1996). However, counsel may be found ineffective for the strategy employed when it is not a sound or reasonable strategy. *People v. Dalesandro*, 165 Mich. App. 569, 577–578, 419 N.W.2d 609 (1988). The burden of establishing the factual predicate for a claim of ineffective assistance is on the defendant. *People v. Hoag*, 460 Mich. 1, 6, 594 N.W.2d 57 (1999).

*Pickens*, 2021 WL 1499318, at \*9. Although the court of appeals cited state law for the authority, *Trakhtenberg* cites *Strickland* as the source of the standard. *Trakhtenberg*, 826 N.W.2 at 143. Thus, there is no question that the court of appeals applied the correct standard. This eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. Therefore, because the court of appeals applied the correct standard, Petitioner can only overcome the deference afforded state court decisions if the determinations regarding ineffective assistance of counsel are unreasonable applications of *Strickland* or if the court of appeals' resolutions were based on unreasonable determinations of the facts. *See* 28 U.S.C. § 2254(d).

### 2.    Ground III(a)—Failure to Object to False Identification Testimony

In ground III(a), Petitioner faults trial counsel for not objecting to "the prosecution's introduction of false identification testimony." (§ 2254 Pet., ECF No. 1, PageID.6.) Specifically, Petitioner contends that counsel should have objected to Yemora Williams' identification testimony as false, and that counsel should have "reasonably expect[ed] that [Williams] would make the same false in-court identification at trial" that she had during her initial interview and at the preliminary examination. (Br. Supp. § 2254 Pet., ECF No. 1-1, PageID.55.)

25

Petitioner raised this argument on direct appeal, and the court of appeals rejected it, stating:

> Finally, as concluded in subsection II of this opinion, there was no evidence that the prosecutor knowingly presented false testimony or that Williams committed perjury. Rather, the shooting occurred directly in front of Williams, and she testified that could identify [Petitioner] from his eyes because he fired his weapon directly in front of her. Although Williams may have been mistaken that [Petitioner] asked her for a ride to the hospital in light of the testimony from Bigelow and Ward, the jury was entitled to believe all, part, or none of her testimony. Contradictory testimony did not reflect that Williams's testimony was false or that she committed perjury or that the prosecutor knowingly presented false testimony. Thus,[Petitioner] failed to meet the burden of demonstrating mistakes apparent on the record. Accordingly, in turn, it cannot be concluded that counsel's performance fell below an objective standard of reasonableness and that, but for the alleged errors, the result of the proceeding would have been different.

*Pickens*, 2021 WL 1499318, at *11.

Petitioner now suggests that the court of appeals' ruling "rests on an unreasonable application of facts" for the same reason that its rejection of his prosecutorial misconduct claim "was based on an unreasonable determination of facts." (Br. Supp. § 2254 Pet., ECF No. 1-1, PageID.55.) For the reasons discussed *supra* in Part III.A, the Court concludes that the court of appeals' determination is entirely consistent with *Strickland*. The Court has concluded that the prosecution did not knowingly present false testimony from Williams, and any argument by counsel otherwise would have been futile. "[O]mitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013); *see also Mahdi v. Bagley*, 522 F.3d 631, 638 (6th Cir. 2008) ("No prejudice flows from the failure to raise a meritless claim."). Accordingly, because Petitioner has not demonstrated that the state courts' rejection of this claim is contrary to, or an unreasonable application of, *Strickland*, Petitioner is not entitled to relief with respect to ground III(a).

### 3.    Ground III(b)—Failure to Investigate and Present Alibi Defense

In ground III(b), Petitioner faults trial counsel for failing to investigate and present a "known alibi defense." (Br. Supp. § 2254 Pet., ECF No. 1-1, PageID.55.) Defendant claims that prior to trial, trial counsel received a written statement from Peter Watkins, who claimed that on the day of the shooting, he and Petitioner were involved a drug sale, and that Petitioner was shot by the buyer. (*Id.*, PageID.56.) Petitioner's phone records indicated that, "consistent with Watkins's story, [Petitioner] received a phone call from an out-of-town phone number, labeled 'Breezy' in [Petitioner's] phone, at 2:06 p.m." (*Id.*) The trial court conducted a *Ginther* hearing regarding this claim upon remand by the Michigan Court of Appeals.

On direct appeal, the Michigan Court of Appeals addressed Petitioner's ineffective assistance claim in the context of his assertion that the trial court erred by failing to grant his motion for a new trial. The court of appeals rejected Petitioner's claim, writing:

> Peter Watkins authored the letter that asserted [Petitioner] was shot when a drug deal between defendant, Watkins, and "Breezy," essentially went "bad." However, trial counsel did not call Watkins as a witness at trial. When appellate counsel called Watkins to the stand at the *Ginther* hearing, Watkins advised the court that, "I'm not about to testify." Indeed, Watkins acknowledged the content of the letter, but declined to confirm its authenticity, repeatedly advising that he could not remember. On cross-examination, Watkins declined to even confirm that he authored the letter and continued to answer any questions with, "I don't know" or "I don't remember." If called to testify at [Petitioner's] trial, Watkins would have simply stated that he could not remember whether he was with defendant on the day of the shooting and to any other details. Watkins even failed to remember what he did the day before or after the barbershop shooting.
>
> [Petitioner's] trial counsel, Henry Scharg, testified that, shortly before trial, [Petitioner] presented the letter prepared by Watkins claiming that [Petitioner] was shot in the park during a drug deal. Scharg did not have the resources for an investigator to interview Watkins because [Petitioner's] family had exhausted their finances. However, Scharg now believed that he should have contacted Watkins's lawyer to determine consent for an interview. Yet, Scharg testified that the alibi theory was inconsistent with the theory being pursued, and he urged [Petitioner] to abandon the alibi although they continued to discuss the issue between 2 and 5

27

times, including at trial. Because of the lack of [Petitioner's] blood present at the crime scene and the eyewitness testimony that the victim shot his assailant (i.e., Gale), it was best to pursue the theory that [Petitioner] was shot elsewhere. Scharg also opined that the alibi provided by Watkins was not supported by the phone records and exploring the phone records was a "waste of my resources." Scharg did not ask [Petitioner] where he was shot until shortly before trial, and [Petitioner] then provided the alibi defense. However, Scharg believed that he looked for a phone call from Watkins in the phone records.

[Petitioner] and Scharg had "rolling" conversations about the alibi defense, but Scharg deemed it to be a "defense of last resort" because it was not generally successful unless there was independent written evidence to support it. Scharg believed that it was more effective to assert that [Petitioner] was shot elsewhere than to claim that he was shot during a drug deal as corroborated by Watkins, an individual [Petitioner] met in jail. The late receipt of the alibi letter was also a concern. Although in retrospect Scharg believed that he should have investigated the alibi defense, he opined that it would not have made a difference in the outcome, but simply demonstrated that all possibilities were exhausted.

The trial court denied [Petitioner's] motion for a new trial in a written opinion. The trial court found that "the failure to pursue the alibi defense did not deny [Petitioner] a substantial defense because the alibi was completely inconsistent with the overwhelming evidence. Trial counsel elected to pursue a strategy that was, in actuality, consistent with the realities of the case rather than pursue an alibi that risked substantial scrutiny in the eyes of the jury." The trial court concluded:

> Ultimately, the Court sees with convincing clarity that trial counsel could not present a defense that was almost certainly fabricated, or at a minimum, was entirely inconsistent with the evidence and trial counsel's reasoned strategy. There was no specific evidence to support that [Petitioner] was shot in an unrelated incident. Accordingly, trial counsel did what he could and supported the theory with circumstantial evidence. Trial counsel should have conducted a minimum investigation by interviewing Mr. Watkins; however, given trial counsel's extensive experience and his testimony pertaining to his overall strategy, this Court does not believe the omission rises to the level of ineffective assistance of counsel. The jury convicted [Petitioner] because of the overwhelming evidence of his guilt, not because trial counsel was ineffective.

In light of the record and the trial court's factual findings and conclusions of law, we conclude that the trial court did not err in denying the motion for new trial. Although the trial court found that Scharg should have conducted an investigation of the alibi offered by Watkins, the trial court concluded that it did not constitute ineffective assistance in light of Scharg's experience as a defense attorney and his trial strategy.

Scharg acknowledged that he was given the Watkins letter before trial. However, Watkins met [Petitioner] in jail when they were housed in the same pod for a lengthy period of time. A close friendship was not reflected in [Petitioner's] cell phone history. The letter proffered by Watkins was not notarized or signed. In the letter, he offered to provide additional information and was "willing to talk," but it did not reflect that he would provide sworn testimony. Indeed, when Watkins was called to testify at the *Ginther* hearing, he declined to provide any details or even recall the drug deal and shooting that gave [Petitioner] an alibi. He simply stated he could not remember any details, but he recognized what was written on the paper. Further, [Petitioner's] parole agent documented an interview that she conducted with Watkins. Watkins asked to act as an informant, but he was told that the nature of his charge in the federal system would not permit it. He purportedly then recanted his alibi for [Petitioner] to his parole agent and further apprised the agent that there was a "hit" on her life.

Because [Petitioner's] phone records did not evidence an extensive relationship with Watkins, the relationship with Watkins was initiated through their time in jail, the phone number for "Breezy," was linked to a female located in Flint and not a male drug dealer, and the possible admission of [Petitioner's] statement that he was shot at the barbershop as impeachment evidence, it is apparent that Scharg, as trial counsel, did not want to pursue the alibi defense. Scharg testified that he addressed this issue with [Petitioner] on multiple occasions, and [Petitioner] reluctantly agreed to not pursue it. Indeed, Watkins's testimony at trial demonstrated that he would not have been a favorable witness and abandoned any alibi for [Petitioner] when it became apparent that it had adverse consequences to himself. In light of the factual findings, the trial court appropriately denied the motion for new trial, and we cannot conclude that it clearly erred.

*Pickens*, 2021 WL 1499318, at *11–12.

Petitioner now contends that the court of appeals' "application of facts was unreasonable." (Br. Supp. § 2254 Pet., ECF No. 1-1, PageID.59.) Petitioner faults the court of appeals for pulling many of the facts "from unsupported allegations contained in the prosecutor's brief on appeal." (*Id.*)

Petitioner first faults the court of appeals for stating that Petitioner's relationship with Watkins was initiated during their time in jail. (*Id.*) Petitioner states that "although it is true that Watkins and [Petitioner] were briefly in jail at the same time after [Petitioner's] arrest, there is no

testimony to support that this is the only time they met. In fact, the only evidence on the matter is [Petitioner's] explanation that he had known Watkins for years." (*Id.*)

During the *Ginther* hearing, Watkins testified that he knew Petitioner before they were incarcerated "at the jail during the time the statement was made." (ECF No. 7-19, PageID.1086.) Watkins testified that he and Petitioner "hung out" and socialized "once in a while." (*Id.*) Watkins testified further that he had known Petitioner for "[a] little while" before they were incarcerated together and before the alleged alibi statement was written. (*Id.*) When asked, Watkins indicated that he considered Petitioner to be a close friend. (*Id.*, PageID.1088.)

Thus, while there is record support for Petitioner's suggestion that he had known Watkins prior to being incarcerated together, the transcript of the *Ginther* hearing reflects that Watkins was hostile to both Petitioner's counsel and the prosecutor, and that he essentially agreed with Petitioner's counsel's questions characterizing the nature of Watkins' relationship with Petitioner. Moreover, although Petitioner indicates that the only evidence on the matter is his own explanation that he had known Watkins for years, Petitioner points to no such evidence in the record. Moreover, the parties stipulated to the admission of business records from the Ingham County Jail showing that Watkins and Petitioner were "in the jail together and same pod and cell area during up and leading to and including [Petitioner's] trial." (ECF No. 7-20, PageID.1129.) Those business records, which are included in the appellate record, indicate that Petitioner and Watkins were in the Ingham County Jail together for at least a year. (ECF No. 7-22, PageID.1345–1356.)

Next, Petitioner faults the court of appeals for noting that Watkins purportedly recanted the alibi to his parole agents. (Br. Supp. § 2254 Pet., ECF No. 1-1, PageID.59.) Petitioner argues that there is no evidence of this on the record, and that Watkins' refusal to testify does not amount to a recantation. (*Id.*) Petitioner argues that "[t]he mention in attorney discourse regarding a report that

30

was not admitted as evidence, by a probation officer that did not testify, is not record evidence, and it should form no part of the foundation for the appellate court's decision." (*Id.*) Contrary to Petitioner's assertion, the State included this report as an exhibit in the appellate record. (ECF No. 7-23, PageID.1359.) The report was prepared by Parole Officer Nancy Hamilton, who noted that Watkins told her during a meeting on December 20, 2019, that he and Petitioner had written a letter "in which [Watkins] liked to give Pickens an alibi." (*Id.*) Accordingly, Petitioner is mistaken when he asserts that there is no record evidence to support the court of appeals' conclusion that Watkins purportedly recanted the alibi to his parole officer.

Petitioner next faults the court of appeals for concluding that Watkins' testimony at the *Ginther* hearing suggested that he would not have been a favorable witness for Petitioner. (Br. Supp. § 2254 Pet., ECF No. 1-1, PageID.59.) Specifically, Petitioner takes issue with the following conclusion: "If called to testify at [Petitioner's] trial, Watkins would have simply stated that he could not remember whether he was with [Petitioner] on the day of the shooting and to any other details." (*Id.*, PageID.60.) Petitioner argues that "Watkins did not testify to that." (*Id.*) Again, Petitioner is mistaken. During cross-examination of Watkins at the *Ginther* hearing, the prosecutor indicated that they were going to pretend that they were at Petitioner's trial. (ECF No. 7-19, PageID.1112.) The prosecutor then proceeded to ask Watkins numerous questions, including whether he was with Petitioner on the day of the shooting, and Watkins responded "I don't remember" to those questions. (*Id.*, PageID.1113–1118.) Thus, the court of appeals' conclusion is directly taken from Watkins' own testimony.

Petitioner also suggests that the court of appeals' conclusion regarding "Breezy's" phone number amounts to "impermissible speculation" because "Breezy" did not testify at the *Ginther* hearing and because "no one testified that they could confirm that 'Breezy' was the actual owner

31

of the phone number that dialed out to [Petitioner] around the time of the Kutt II incident." (Br. Supp. § 2254 Pet., ECF No. 1-1, PageID.60.) In his alleged alibi statement, Watkins noted that Petitioner met with a "guy" during the drug deal, and that Petitioner was shot by that individual. (ECF No. 7-24, PageID.1481.) At the *Ginther* hearing, Detective Quincy Scroggins testified that he investigated the number associated with "Breezy," and that a database indicated that a 25-year old female named Brittany Boles, who lives in Flint, was the owner of that phone number. (ECF No. 7-19, PageID.1063–1064.) On cross-examination, however, Detective Scroggins admitted that he did not speak to Ms. Boles, and that a phone does not necessarily always belong to the person whom it is linked to in databases. (*Id.*, PageID.1069.) In light of that testimony, it was entirely proper for the court of appeals to note that conclusion in its opinion.

In light of the foregoing discussion, Petitioner offers no evidence, much less clear and convincing evidence, to overcome the presumption of correctness afforded to the state courts' factual determinations. Moreover, Petitioner's suggestion that the court of appeals' ruling "rests on improper application of federal law" is misplaced. (*See* Br. Supp. § 2254 Pet. ECF No. 1-1, PageID.62.) Petitioner argues that the state courts did not make a finding that trial counsel's decision not to present the alibi defense was actually a matter of strategy and, therefore, that this Court need not "grant the Michigan courts any deference with respect to this conclusion." (*Id.*, PageID.63 n.2.)

Petitioner's argument regarding an improper application of *Strickland*, however, focuses only on the deficient performance prong and fails to provide any argument regarding the prejudice prong. The court of appeals adopted the trial court's conclusion that counsel's failure to pursue the alibi defense "did not deny [Petitioner] a substantial defense because the alibi was completely inconsistent with the overwhelming evidence." *See Pickens*, 2021 WL 1499318, at *12. Here,

32

Petitioner argues that his "only identification as the shooter in this case was false," and that if the jury "heard and considered alibi evidence, they likely would have found reasonable doubt as to the accuracy of the information." (Br. Supp. § 2254 Pet., ECF No. 1-1, PageID.58.) As discussed *supra*, this Court has already rejected Petitioner's argument that Williams' identification testimony was patently false. Moreover, the Court has already concluded that the State presented sufficient evidence to support Petitioner's convictions. Any testimony by Watkins would not have changed this outcome, particularly in light of the *Ginther* hearing testimony suggesting that Watkins would have responded "I don't remember" to almost any questions posed to him regarding the day of the shooting. *See Ballinger v. Prelesnik*, 709 F.3d 558, 563 (6th Cir. 2013) (concluding that habeas petitioner could not show prejudice from counsel's failure to call an alibi witness where two eyewitnesses positively identified the petitioner as the perpetrator).

In light of the foregoing, Petitioner has not demonstrated that the state courts' rejection of this ineffective assistance claim is contrary to, or an unreasonable application of, *Strickland*. Petitioner, therefore, is not entitled to relief with respect to ground III(b).

## IV.    Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467.

Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## <u>Conclusion</u>

The Court will enter an order and judgment denying the § 2254 petition as well as a certificate of appealability.

Dated:    January 31, 2025                          /s/ Paul L. Maloney
                                                    Paul L. Maloney
                                                    United States District Judge